# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JOHN SEMMA ,**

      **Plaintiff,**

**v.**                                      **Case No.  8:06-cv-570-T-30TGW**

**PRINCIPAL LIFE INSURANCE
COMPANY,**

      **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Principal Life Insurance Company's Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. #9), Plaintiff's Response to Defendant's Summary Judgment Motion on Plaintiff's Accelerated Life Insurance (ALI) Benefit Claims (Dkt. #12), and Plaintiff's Response to Defendant's Motion for Summary Judgment on Plaintiff's Accidental Death & Dismemberment (AD&D) Benefit Claims (Dkt. #13).  The Court, having considered the motion, responses, exhibits, memoranda, and being otherwise advised in the premises, finds that Defendant's motion should be granted.

Plaintiff, John Semma ("Plaintiff" or "Mr. Semma") seeks to recover accidental death and dismemberment ("ADD") benefits and accelerated life insurance ("ALI") benefits under Group Policy No. P90181 (the "Policy") issued by Defendant, Principal Life Insurance Company ("Defendant" or "Principal Life"), to Plaintiff's employer, Baycare Health System

("Baycare").  Plaintiff was eligible for benefits under the Policy through his employment

with Baycare.  Plaintiff applied for ADD benefits based on the loss of vision in his left eye

and for ALI benefits based on renal failure.  The Policy was issued on January 1, 2003.

## Undisputed Facts Relating to Loss of Vision Claim

In 1962, a foreign body made of pig iron entered Plaintiff's left eye while Plaintiff

was hammering a rock.  A piece of the hammer became embedded in Plaintiff's eye,

resulting in complications of retinal detachment and retained foreign body.  In 1968, the

retinal detachment was repaired, which culminated into a second cataract.  Mr. Semma has

been considered legally blind in his left eye since November 2000.[1]

In May or June of 2004, Plaintiff noticed a change in the condition of his left eye,

including the loss of the curtain before his left eye.  As a result, on July 1, 2004, Plaintiff

visited Dr. Jonathan Mines of Bay Area Retina Consultants ("Dr. Mines").  During this

consultation, Plaintiff told Dr. Mines that "he was engaged in underwater activities including

snorkeling in the Keys of late."[2]  On July 6, 2004, Dr. Mines notes that Plaintiff's "left

cataract became dislocated following prolonged prone positioning and snorkeling in the

Florida Keys."[3]

On July 6, 2004, Plaintiff underwent vitrectomy surgery for the left eye on the

afternoon of July 6, 2004.  The vitrectomy was successfully initiated with removal of the

---

[1] See Dkt. #9-4, ADR-137.

[2] See Dkt. #9-3, ADR-156.

[3] See Dkt. #9-3, ADR-158.

intraocular foreign body from the left globe.  However, massive hemorrhaging occurred in the left vitreous cavity due to prolonged Vitamin E therapy preventing the removal of the dislocated cataract fragments from Plaintiff's left eye and resulting in termination of the surgical procedure.

On or about February 28, 2005, Plaintiff filed a claim for ADD benefits due to total loss of use of his left eye.[4]  At the time of filing, Plaintiff was employed as a physical therapist by Baycare.  In his claim form, Plaintiff stated that the vision loss occurred on July 6, 2004 during surgery to remove a foreign body from his eye, and the accident causing the loss was from "severe hemorrhaging during vitrectomy/foreign body removal."  The Attending Physician's Statement dated March 22, 2005, provided by Dr. Mines describes the accident causing loss as "intrasurgical hemorrhage/prior anatomic changes."  Dr. Mines statement acknowledges that Plaintiff's prior injury contributed to his loss of vision and specifically attributes such contribution to Plaintiff's accident in 1962, leading to the dislocation of his natural lens.[5]  Dr. Mines also acknowledges that Plaintiff's loss of vision in his left eye is permanent and irreversible.

On May 4, 2005, Defendant denied Plaintiff's claim for ADD benefits under the Policy.[6]  On July 11, 2005, Plaintiff appealed the denial.  On September 9, 2005, after

---

[4] See Dkt. #9-3, ADR-0001.

[5] See Dkt. #9-3, ADR-0002.

[6] See Dkt. #9-3, ADR-0004.

reconsidering the claim, Defendant reaffirmed its denial.   Plaintiff has exhausted his

administrative remedies on this claim.

### Undisputed Facts Relating to End-Stage Renal Failure Claim

On March 7, 2005, Plaintiff also filed a claim for Accelerated Life Insurance benefits

under the Policy.  The Attending Physician's Statement dated April 4, 2005, provided by Dr.

Reddy states that the Plaintiff's condition is not terminal, but that Plaintiff will need dialysis

within six months.[7]   Pursuant to Dr. Reddy's Consultation Followup Note dated June 13,

2005, Dr. Reddy states, in pertinent part:

> The patient has reached end-stage renal disease.  We are awaiting peritoneal
> dialysis and catheter placement.  Without dialysis, his life span is expected to
> be less than 12 months.  He needs this information for his insurance coverage.
> If Principal, which is his insurance company has any further questions, they
> can feel free to contact me.  Otherwise, he will wait for peritoneal dialysis and
> catheter placement and start dialysis two weeks after this is placed, provided
> there is no leakage.  He is to continue the rest of his transplant workup as
> usual.

Subsequently, on June 15, 2005, Plaintiff underwent a peritoneal dialysis catheter placement

procedure.

In December of 2005, Dr. James Wood, a physician board certified in internal

medicine with a sub-specialty certificate in nephrology, performed a peer review.[8]   In

conjunction with the peer review, on December 21, 2005, Dr. Wood spoke with Dr. Reddy

regarding Plaintiff's condition.  Dr. Reddy indicated that Plaintiff was doing well on dialysis

---

[7] See Dkt. #9-4, ADR-0030.

[8] See Dkt. #9-4, ADR-0333.

and is being worked up for a kidney transplant.  Dr. Reddy also stated that he could not

predict Plaintiff's mortality or lifespan, and that Plaintiff is very compliant and active.

Pursuant to Dr. Wood's Peer Review Report, the expected survival for a 55 year-old male

without diabetes who began peritoneal dialysis in the last seven months would likely be at

least five years.  In addition, Dr. Woods opines that since Plaintiff is receiving renal

replacement therapy and does not have an attendant terminal comorbidity, he is not terminal

or expected to be terminal in the next twelve months.

On May 24, 2005, Defendant denied Plaintiff's claim for ALI benefits under the

Policy.[9]  On or about July 19, 2005, Plaintiff appealed the denial.  On January 4, 2006, after

reconsidering the claim, Defendant reaffirmed its denial.  Plaintiff has exhausted his

administrative remedies on this claim.

I.      **Summary Judgment Standard**.

Summary judgment is appropriate only where there are no genuine issues of material

fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  "A genuine issue of material fact does not exist unless there is

sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in

its favor."  _Haves v. City of Miami_, 52 F.3d 918, 921 (11th Cir. 1995).  At the summary

judgment stage, the judge's function is not to "weigh the evidence and determine the truth

_____

[9] See Dkt. #9-4, ADR-0021.

of the matter, but to determine whether there is a genuine issue for trial." <u>Anderson v.</u>
<u>Liberty Lobby</u>, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, the court views all evidence in the
light most favorable to the party opposing the motion. <u>Harris v. H & W Contracting Co.</u>, 102
F.3d 516, 519 (11th Cir. 1996). The moving party bears the initial burden of demonstrating
the absence of a genuine issue of material fact. If the movant meets this burden, the burden
then shifts to the nonmoving party to establish that a genuine dispute of material fact exists.
<u>See</u> <u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993). The nonmoving
party may not simply rest on the pleadings, but must use affidavits, depositions, answers to
interrogatories, or other admissible evidence to demonstrate that a material fact issue remains
to be tried. <u>Celotex</u>, 477 U.S. at 324.

## II.    **ERISA Standard of Review**.

The insurance policy at issue is an employee welfare benefit plan governed by the
Employee Retirement Income Security Act of 1964, 29 U.S.C. §1001 et seq. (ERISA).
Section 1132 (a)(1)(B) of ERISA provides that a plan participant or beneficiary may bring
a civil action in district court "to recover benefits due to him under the terms of his plan."
ERISA, however, does not specify the standard to be applied when reviewing a claims
administrator's decision to deny benefits. To fill this gap, in <u>Firestone Tire & Rubber Co.</u>
<u>v. Brunch</u> the Supreme Court held: "a denial of benefits challenged under §1132(a)(1)(B) is
to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire & Rubber Co. v. Brunch, 489 U.S. 101, 115 (1989).

Subsequent to and consistent with the Supreme Court's decision in Firestone, the Eleventh Circuit set forth three standards of review that a court may apply in reviewing a plan administrator's claims decisions: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997).

The court must follow a series of steps to make a specific determination as to which standard of review it should apply.  First, it must look at the plan documents to determine whether the claims administrator is given discretion.  HCA Health Services of Georgia v. Employers Health Ins. Co., 240 F.3d 982, 995 (11th Cir. 2001).  If the court finds that the documents grant discretion to the claims administrator, it applies either the arbitrary and capricious standard or the heightened arbitrary and capricious standard.  Id.  Second, the court evaluates the claims administrator's interpretation of the plan to determine whether it is "wrong," regardless of whether the arbitrary and capricious review or the heightened arbitrary and capricious review applies.  Jordan v. Metropolitan Life Insurance Co., 205 F.Supp.2d 1302, 1306 (M.D. Fla. 2002); see also HCA Health at 993 n. 23 (" 'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim administrator's plan interpretation.")  If the court concludes that the plan administrator's

determination is "wrong," the court must then decide whether "the claimant has proposed a 'reasonable' interpretation of the plan." <u>Jordan</u> at 1306, quoting <u>Lee v. Blue Cross/Blue Shield</u>, 10 F.3d 1547, 1550 (11th Cir. 1994).

In the present case, the Court must first determine whether the plan documents vest discretionary authority in Defendant.  In the Policy, Defendant Principal Life Insurance Company is called "The Principal."  Part II, Section A, Article 10 of the Policy states:

> The Principal has complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided. The decisions of the The Principal's in such matters shall be controlling, binding, and final as between The Principal and persons covered by the Group Policy, subject to the Claims Procedures in Part IV, Section D.

Thus, Article 10 of the Policy expressly states that Defendant has complete discretion to construe or interpret the terms of the Policy and to determine eligibility for benefits. Accordingly, the Court concludes that the Policy grants discretionary authority to Defendant; thus, the correct standard of review is either "arbitrary and capricious" or "heightened arbitrary and capricious," depending on whether a conflict of interest exists.

Since the Court concludes that the Policy grants discretion to Defendant, next the Court must evaluate the Defendant's interpretation of the Policy to determine whether it is "wrong," regardless of whether arbitrary and capricious review or the heightened arbitrary and capricious review applies.  The Eleventh Circuit has held that, when applying the arbitrary and capricious standard to an ERISA benefits denial case, the court must determine if there was a reasonable basis for the denial, "based upon the facts known to the

administrator at the time the decision was made." <u>Payne v. Ryder System, Inc. Long Term</u>

<u>Disability Plan</u>, 173 F.R.D. 537, 542 (M.D. Fla. 1997), quoting <u>Jett</u>, 890 F.2d 1137, 1140.

"As long as a reasonable basis appears for its decision, it must be upheld as not being

arbitrary and capricious, even if there is evidence that would support a contrary decision."

<u>Id.</u>, quoting <u>Jett</u>, 890 F.2d at 1140.

A heightened standard of review is appropriate in certain cases where an insurer is

also the claims fiduciary entrusted with determining the eligibility benefits under an ERISA

plan. <u>Payne</u>, 173 F.R.D. at 542. Even under this heightened standard of review, summary

judgment is appropriate where there is no evidence of bias and no evidence of abuse of

discretion. <u>Id.</u>

## III.     Determination of Loss of Vision Claim.

The Policy was issued with an effective date of January 1, 2003. On February 28,

2005, Plaintiff filed a claim for ADD benefits due to total loss of use of his left eye. Pursuant

to Part IV, Section B, Article 2 of the Policy, to qualify for ADD benefits, all of the

following must occur:

      a.     The Member must be injured while insured for Member Accidental Death and Dismemberment Insurance under this Group Policy; and

      b.     the injury must be through external, violent, and accidental means; and

      c.     the injury must be the direct and sole cause of a loss listed in Section B, Article 3; and

      d.     the loss must occur within 365 days of the injury; and

      e.     the limitations listed in this Section B, Article 10, must not apply; and

      f.     claim requirements listed in this PART IV, Section D, must be satisfied; and

      g.     all medical evidence must be satisfactory to The Principal.

Additionally, pursuant to Part IV, Section B, Article 3, Subsection (d) of the Policy, if all of the benefit qualifications are met, The Principal will pay, in pertinent part: 50% of the Scheduled Benefit (or approved amount, if applicable) in force if the sight of one eye is permanently lost (For this purpose, vision not correctable to better than 20/200 will be considered loss of sight.).

After reviewing Plaintiff's claim form and Plaintiff's Attending Physician's Statement, Defendant determined that Plaintiff's injury was not incurred through external, violent and accidental means; Plaintiff's injury was not the direct and sole cause of Plaintiff's loss of vision; and Plaintiff's loss of vision did not occur within 365 days of the injury. Further, pursuant to the limitations found in Section B, Article 10, Defendant determined that payment will not be made for any loss to which a contributing cause is "disease or the treatment of disease." Since Plaintiff was unable to meet all the necessary qualifications for ADD benefits as required by the Policy, Defendant determined that Plaintiff's claim is excluded from coverage.

### A.     Injury Must Be Through External, Violent, and Accidental Means.

Pursuant to Plaintiff's claim form and Attending Physician's Statement, Plaintiff's total loss of vision was caused by severe intrasurgical hemorrhaging following the removal of a metallic foreign body from his left eye.[10] The scheduled surgery to remove a foreign

---

[10] In Dr. Mines' consultation notes to Dr. Jose Santana, Dr. Mines states: "The patient notes that he has recently had a change in the condition within the left eye. This included a loss of the curtain before the left eye. The patient notes that he was engaged in underwater activities including snorkeling in the Keys of late. Since that time, there has been discomfort in the left eye. This has

(continued...)

body from Plaintiff's eye cannot be considered "violent."  Plaintiff experienced unexpected hemorrhaging during surgery which prevented the removal of a dislocated cataract.  Since the surgery, Plaintiff's left eye condition has digressed from legally blind to total loss of vision.

### B.    Injury Must Be the Direct and Sole Cause of Loss.

The Attending Physician's Statement also indicates that Plaintiff incurred a prior injury in 1962 that contributed to Plaintiff's vision loss, to wit: dislocation of the natural lens. In 1968, the retinal detachment was repaired, which culminated into a second cataract.  While the 1968 repair might have improved Plaintiff's vision in his left eye to some extent, Plaintiff has been legally blind in his left eye since at least November of 2000.  In May or June of 2004, Plaintiff noticed a change in the condition of his left eye, including a loss of the curtain before his left eye.  In July of 2004, Plaintiff underwent surgery in the hope of removing a foreign body from his eye as well as a retained dislocated cataract.  Although the foreign body was successfully removed, Dr. Mines was unable to remove the cataract as a result of severe hemorrhaging.

Dr. Mines associates the hemorrhage with Plaintiff's use of Vitamin E in large doses prior to surgery.  While the unsuccessful surgery contributed to Plaintiff's total loss of vision, the surgery cannot be considered the direct and sole cause of loss.  If not for Plaintiff's prior foreign body injury that occurred in 1962, resulting in complications of retinal detachment

_____

[10](...continued)
recently been diagnosed as being consistent with iritis within the left globe."  The Court notes that Plaintiff has not asserted or argued that Plaintiff's injury was the result of a scuba diving accident.

that were repaired in 1968, but then reoccurred in May or June of 2004, Plaintiff would not have required surgery in July of 2004.  Thus, Plaintiff's surgery on July 6, 2004 cannot be considered the "direct and sole cause" of Plaintiff's total loss of vision.

Plaintiff argues that "loss of sight" is a term that is not defined in the Policy and that Plaintiff's loss was a loss of "useful vision," because prior to surgery Plaintiff possessed peripheral vision in the left eye, but after surgery Plaintiff's vision regressed to complete loss of light perception.  Plaintiff's argument is unpersuasive.

The Policy defines "loss of sight" as "vision not correctable to better than 20/200." Plaintiff has offered no evidence supporting the argument that Plaintiff's vision prior to July of 2004 was correctable to better than 20/200.[11]  In *arguendo*, if Plaintiff's vision was not correctable to better than 20/200 prior to surgery in July of 2004, then under the terms of the Policy the sight in his left eye was already "lost."  Further, the extent of Plaintiff's loss of sight (whether 20/20 to total blindness or peripheral vision only to total blindness) is irrelevant under the Policy unless Plaintiff's injury is the direct and sole cause of Plaintiff's loss of sight.

### C.    Loss Must Occur Within 365 days of injury.

Once again, Plaintiff's original injury occurred in 1962 when a piece of pig iron embedded in his eye, resulting in complications of retinal detachment and retained foreign body.  In 1968, the retinal detachment was repaired, which culminated into a second cataract.

---

[11] Neither party refutes that Plaintiff has been legally blind in his left eye since November of 2000, however, neither party has indicated whether, prior to July of 2004, Plaintiff's vision was correctable to better than 20/200.

Plaintiff has been considered legally blind since at least November of 2000. The record shows that in May or June of 2004, after engaging in underwater activities Plaintiff noticed a change in the condition of his eye, including the loss of the curtain before his eye. However, Plaintiff has not argued that his injury was the result of snorkeling (the record reflects that Plaintiff still possessed peripheral vision after snorkeling), rather Plaintiff asserts that his injury is the result of his July 2004 surgery (surgery that Plaintiff underwent for the purpose of removing the pig iron that had been in his eye since 1962 and the cataract that had been in his eye since 1968). Accordingly, it is clear to this Court that Plaintiff's injury occurred approximately 40 years ago. Thus, Plaintiff's loss of peripheral vision could not have occurred within 365 days of his injury.

Further, the burden is on Plaintiff to show that his loss of vision occurred during the Policy period. Under the Policy, vision not correctable to better than 20/200 will be considered loss of sight. Thus, in order to qualify for benefits under the Policy for the loss of an eye, Plaintiff must show: (1) that his vision was correctable to better than 20/200 during the Policy period and prior to his claimed injury; and (2) after his injury his vision was no longer correctable to better than 20/200. Plaintiff has not shown, nor attempted to argue, that his vision was correctable to better than 20/200 during the Policy period and prior to his claimed injury.

For these reasons, the Court concludes that because Defendant is given broad discretion in interpreting the terms of the Policy, it was reasonable that it determined, with the knowledge that it possessed at the time that it denied Plaintiff's claim, and at the time it

reviewed his appeal, that Plaintiff's injury was not incurred through "external, violent and accidental means;" Plaintiff's injury was not "the direct and sole cause" of Plaintiff's loss of vision; and Plaintiff's loss of vision did not occur within 365 days of the injury.  Since the Court concludes that Defendant's determination was not wrong, it need not inquire into whether Plaintiff proposed a reasonable interpretation of the Policy.  Further, Plaintiff has offered no evidence that Defendant has acted in bad faith or had improper motives.

Accordingly, the Court concludes that Defendant's decision in regard to the denial of Plaintiff's loss of vision claim was proper and summary judgment in Defendant's favor as to Plaintiff's claim for Accidental Death and Dismemberment Insurance benefits should be granted.

**IV.     Determination of End-stage Renal Failure Claim.**

The Policy was issued with an effective date of January 1, 2003.  On March 7, 2005, Plaintiff filed a claim for ALI benefits due to the on-set of end-stage renal disease.

Pursuant to Part IV, Section A, Article 7, Subsection (c) of the Policy, to qualify for ALI benefits, a Member must:

(1)     be Terminally Ill and insured for a Member Life Insurance benefit of
at least $10,000; and

(2)     send a request for Accelerated Benefit payment to The Principal; and

(3)     provide proof satisfactory to The Principal that he or she is Terminally
Ill.

Pursuant to Part IV, Section A, Article 7, Subsection (d) of the Policy, proof that a Member is Terminally Ill will consist of:

(1)     a statement from the Member's Physician; and

(2)     any other medical information that The Principal believes necessary to confirm the Member's status.

Additionally, Part IV, Section A, Article 7, Subsection (a) and (b) state:

Definition of Terminally Ill:

A Member will be considered Terminally Ill under this article of this Group Policy if he or she has experienced a Qualifying Event and is expected to die within twelve months of the date he or she requests payment of Accelerated Benefits.

Definition of Qualifying Event:

A Qualifying Event is a medical condition which would, in the absence of extensive or extraordinary medical treatment, result in a drastically limited life span.   Such conditions may include, BUT ARE NOT LIMITED TO one or more of the following:

(1)     coronary artery disease resulting in an acute infarction or requiring surgery;
(2)     permanent neurological deficit resulting from cerebral vascular accident;
(3)     end stage renal failure; or
(4)     acquired immune deficiency syndrome (AIDS).

After reviewing Plaintiff's claim form and Plaintiff's Attending Physician's Statement,  Defendant determined that Plaintiff's condition was not terminal.  As a result, Defendant determined that Plaintiff did not qualify for ALI benefits under the Policy.

## A.     Plaintiff does not meet the definition of Terminally Ill.

In order to be considered "Terminally Ill" under the Policy, Plaintiff must experience "a Qualifying Event and be expected to die within twelve months of the date he or she requests payment of Accelerated benefits."  Neither party appears to dispute the fact that Plaintiff has experienced a "Qualifying Event." Plaintiff is currently experiencing "end stage

renal failure" which is specifically listed in the Policy as a medical condition considered to be a Qualifying Event.   But experiencing a Qualifying Event is just one of the two requirements necessary in order to be considered "Terminally Ill" under the Policy.  Plaintiff must also be expected to die within twelve months of the date he made his requests (in this case within 12 months of March  7, 2005).

Plaintiff's Attending Physician's Statement dated April 4, 2005, provided by Dr. Reddy specifically states that Plaintiff's condition is not terminal (Dr. Reddy answered "no" to the question: "Is patient's condition terminal?").  Dr. Reddy does state that Plaintiff will need dialysis within six months.  Further, in Dr. Reddy's Consultation Followup Note dated June 13, 2005, Dr. Reddy acknowledges, "without dialysis, his [Plaintiff's] life span is expected to be less than 12 months."

On June 15, 2005, Plaintiff underwent a peritoneal dialysis catheter placement procedure.  On or about December 21, 2005, Dr. Reddy acknowledged that Plaintiff is doing well on dialysis and is being worked up for a kidney transplant.  Dr. Reddy also admitted that he could not predict Plaintiff's mortality or lifespan, and that the patient is very compliant and active.  Additionally, pursuant to a Peer Review Report dated December 16, 2005, the expected survival for a 55 year-old male without diabetes who began peritoneal dialysis in the last seven months would likely be at least five years.

Plaintiff has offered no evidence or medical opinion contesting a five year expected survival rate.  Rather, Plaintiff has argued that Plaintiff would have been expected to die within twelve months if he had refused dialysis treatment.  The Court is unpersuaded by this

argument for two reasons. First, Plaintiff accepted dialysis treatment and is responding well. Second, Plaintiff's own Attending Physician stated that Plaintiff's condition was not terminal.[12]

For these reasons, the Court concludes that because Defendant is given broad discretion in interpreting the terms of the Policy, it was reasonable that it determined, with the knowledge that it possessed at the time that it denied Plaintiff's claims, and at the time it reviewed his appeal, that Plaintiff was not "Terminally Ill" as defined in the Policy. Further, Plaintiff failed to provide proof that he was terminally ill by providing a statement from his physician attesting to the same as required by the Policy. Since the Court concludes that Defendant's determination was not wrong, it need not inquire into whether Plaintiff proposed a reasonable interpretation of the Policy. Further, Plaintiff has offered no evidence that Defendant has acted in bad faith or had improper motives.

Accordingly, the Court concludes that Defendant's decision in regard to the denial of Plaintiff's end stage renal failure claim was proper and summary judgment in Defendant's favor as to Plaintiff's claim for Accelerated Life Insurance benefits should be granted.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendant Principal Life Insurance Company's Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. #9) is GRANTED.

---

[12] Article 7, Subsection (d) requires a statement from the Member's Physician that the Member is indeed "Terminally Ill." Plaintiff has not provided such a statement to Defendant or to this Court.

2.      The Clerk is directed to enter Judgment in favor of Defendant, Principal Life

Insurance Company, and against Plaintiff, John Semma.

3.      The Clerk is further directed to terminate any pending motions and to CLOSE

this case.

**DONE** and **ORDERED** in Tampa, Florida on October 6, 2006.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2006\06-cv-570.msj 9.wpd